UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

RAJASHUWEH RHODES,

               Defendant.

---

24-CR-579 (DEH)

ORDER

DALE E. HO, United States District Judge:

      Mr. Rhodes is charged under 18 U.S.C. § 922(g)(1) with one count of possessing a firearm after a felony conviction, after a gun was recovered from his waistband by six New York City Police Department ("NYPD") officers. On February 25, 2025, Mr. Rhodes moved to suppress the gun on the grounds that, at the time the NYPD officers discovered it, they had neither probable cause to effectuate a search incident to arrest nor reasonable suspicion to conduct a stop and frisk pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968).[1] *See* Def.'s Mem. in Supp. of Mot. to Suppress, ECF No. 22. Thus, Mr. Rhodes argues, the gun is the fruit of an unconstitutional search. *Id.* at 18. After full briefing from the parties, the Court held an evidentiary hearing on April 11, 2025, after which the parties submitted supplemental briefs. For the reasons explained below, and after having carefully considered the parties' written arguments, oral arguments, and evidentiary submissions (including body camera footage of the events in question), Mr. Rhodes's Motion to Suppress is **DENIED**.[2]

---

[1] In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

[2] The Court delivered a modified version of this opinion from the bench on June 23, 2025.

## BACKGROUND

On June 5, 2024, Detective Hector Vargas was conducting remote surveillance of the intersection of Madison and Rutgers Streets in the Lower East Side of Manhattan.[3] Compl. ¶ 3(a), ECF No. 1. Detective Vargas observed Mr. Rhodes, whose face was clearly visible, on the surveillance cameras. *Id.* The detective immediately recognized Mr. Rhodes; as of June 5, 2024, Detective Vargas had multiple prior in-person interactions with Mr. Rhodes, had remotely surveilled Mr. Rhodes on "numerous occasions," and had arrested Mr. Rhodes the prior year on an Attempted Criminal Possession of a Weapon in the Second Degree charge (to which Mr. Rhodes ultimately pleaded guilty).[4] *Id.* Additionally, Detective Vargas "was aware that [Mr. Rhodes] had multiple prior arrests in the Lower East Side of Manhattan." *Id.*

Detective Vargas surveilled Mr. Rhodes for more than an hour, from 7:42 P.M to 9:15 P.M. *Id.* ¶ 3(b). During that time, Detective Vargas observed Mr. Rhodes move in a way that suggested he was carrying a firearm. *See id.* Specifically, Detective Vargas observed Mr. Rhodes "hold[] his left hand with cupped fingers against the front of his hooded sweatshirt at the location of his waistband" and bend over "in a manner consistent with Rhodes carrying a hard, hand-held size object beneath his hooded sweatshirt in the front of his waistband, which was perceptibly affecting his gait and overall mobility." *Id.* Consistent with his "training and experience," this suggested to Detective Vargas that Mr. Rhodes was concealing a firearm at his "waist with the aid of one or more layers of spandex worn beneath the sweatshirt and sweatpants." *Id.* In addition to Mr. Rhodes's physical movements, Detective Vargas also believed that certain actions Mr. Rhodes took were suspicious, including Mr. Rhodes walking away when the police arrived at the

---

[3] The Complaint refers to Detective Vargas pseudonymously as "PO-1."

[4] Mr. Rhodes's Attempted Criminal Possession of a Weapon in the Second Degree conviction is the predicate offense for his pending felon-in-possession charge.

intersection to investigate a dispute to which Mr. Rhodes was not a party. *See id.* Detective Vargas thought this odd because "typically Rhodes would remain at the scene of such disputes and actively engage with police officers." *Id.*

Based on his observation of Mr. Rhodes, his knowledge of Mr. Rhodes's criminal history, his prior participation in the seizure of six guns at the intersection at which Mr. Rhodes was hanging out, and his being aware that there had been multiple shootings at that intersection, Detective Vargas developed suspicion that Mr. Rhodes was carrying a gun. *See id.* ¶¶ 3(a)-(b). Detective Vargas then directed other NYPD officers, including Detective Brian Brandefine,[5] "to locate and stop [Mr. Rhodes] for the purpose of investigating his suspected possession of a firearm." *Id.* ¶ 3(c). "A short time later," Detective Vargas observed Mr. Rhodes "walk into a bodega located at the intersection of Madison Street and Rutgers Street." *Id.* ¶ 3(f). Detective Vargas relayed this information to Detective Brandefine, who entered the bodega with five other police officers with the purpose of stopping Mr. Rhodes. *See id.* ¶ 3(g); Gov't May 2, 2025 Letter at 10, ECF No. 28.

Once inside the bodega, Detective Brandefine observed Mr. Rhodes standing in line at the bodega behind several other customers.[6] *See, e.g.*, Gov't May 2, 2025 Letter at 1 (describing the bodega as "crowded"). Detective Brandefine approached Mr. Rhodes with his arms outstretched, instructing Mr. Rhodes to "stay calm." Compl. ¶ 3(g). Mr. Rhodes stood in place unwrapping a candy bar as Detective Brandefine approached him. Def.'s Reply Mem. in Further Supp. of Mot. to Suppress at 17-20, ECF No. 25. He held the candy bar in one hand and the wrapper in his other

---

[5] The Complaint refers to Detective Brandefine pseudonymously as "PO-2."

[6] The Court has reviewed footage captured by Detective Brandefine's body-worn camera, which recorded the entirety of the detective's interaction with Mr. Rhodes as well as the moments preceding their scuffle.

3

hand. *Id.* He lowered the hand holding the candy wrapper toward his side. *Id.* As he did so, that arm made contact with Detective Brandefine's outstretched arm. *Id.* Detective Brandefine proceeded to force Mr. Rhodes to the ground, at which point he identified and recovered a gun from Mr. Rhodes's waistband. *Id.* at 21; Compl. ¶ 3(g).

Mr. Rhodes moves to suppress the gun. Def's Mot. to Suppress, ECF No. 21. He argues that the police did not have probable cause to arrest him, making the gun a fruit of an unconstitutional search and seizure under the Fourth Amendment. Def.'s Mem. in Supp. of Mot. to Suppress at 12-13. In the alternative, Mr. Rhodes argues that the police did not have reasonable suspicion to stop and frisk him, again making the gun the fruit of an unconstitutional search and seizure. *Id.* at 18.

## LEGAL STANDARD

The Fourth Amendment to the United States Constitution safeguards "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. To prevent the "reduc[tion of] the Fourth Amendment to a form of words," *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920), the Supreme Court has crafted the exclusionary rule, under which "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure," *United States v. Calandra*, 414 U.S. 338, 347 (1974). Suppression of unconstitutionally obtained evidence is warranted under the exclusionary rule "when the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights." *United States v. Stokes*, 733 F.3d 438, 443 (2d Cir. 2013).

On "a motion to suppress, the defendant bears the initial burden of establishing that a government official acting without a warrant subjected him to a search or seizure. Once the defendant has met this burden, the burden then shifts to the government to demonstrate by a

4

preponderance of the evidence, that the search or seizure did not violate the Fourth Amendment." *United States v. Herron*, 18 F. Supp. 3d 214, 221 (E.D.N.Y. 2014).

## DISCUSSION

There is no dispute that the NYPD officers stopped and searched Mr. Rhodes without a warrant. Mr. Rhodes has therefore met his initial burden, and the Government must prove, by a preponderance of the evidence, that the stop and search did not violate the Fourth Amendment. The Government argues, *inter alia*, that (I) Detective Brandefine was effectuating a *Terry* stop of Mr. Rhodes when he discovered Mr. Rhodes's gun, obviating the need for a warrant, and (II) Detective Brandefine possessed the requisite reasonable articulable suspicion to *Terry* stop Mr. Rhodes, rendering the stop constitutional. The Court considers each argument in turn.

### I.     The NYPD *Terry* Stopped Mr. Rhodes

The parties dispute whether Detective Brandefine's initial contact with Mr. Rhodes in the bodega is properly characterized as an arrest or as a stop pursuant to *Terry*. An arrest is a quintessential seizure under the Fourth Amendment, and warrantless arrests require that the police have probable cause to believe that the arrestee has committed or is committing a criminal offense. *See, e.g.*, *United States v. Cruz*, 834 F.2d 47, 50 (2d Cir. 1987). By contrast, in making a stop pursuant to *Terry v. Ohio*, the police may "temporarily detain a person and to pat him down for weapons '*even though there is no probable cause to make an arrest*.'" *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) (emphasis added) (quoting *Terry*, 392 U.S. at 22-25). Rather than probable cause, *Terry* stops require a police officer have "reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

Usually, *Terry* stops are less intrusive than arrests. In a typical *Terry* stop, a police officer "briefly seize[s] someone and conduct[s] a limited search for weapons." *United States v. Swindle*, 407 F.3d 562, 563 n.2 (2d Cir. 2005). These characteristics—a *brief* seizure and *limited* search—

5

help ensure that *Terry* stops are "limited to the degree of intrusion necessary to confirm or dispel the reasonable suspicion that justifies the stop in the first place." *Grice v. McVeigh*, 873 F.3d 162, 167 (2d Cir. 2017). "If an investigative stop based on reasonable suspicion continues too long or becomes unreasonably intrusive, it will ripen into a de facto arrest that must be based on probable cause." *United States v. McDow*, 206 F. Supp. 3d 829, 853-54 (S.D.N.Y. 2016) (citing *United States v. Babwah*, 972 F.2d 30, 33 (2d Cir. 1992)).

Here, Mr. Rhodes argues that the police seized and immediately searched him, and that his interaction with Detective Brandefine "was not a lawful *Terry* stop and frisk," because the detective and the other officers "went straight to a highly forcible detention accompanied by a contemporaneous search" when they confronted him in the bodega. Def.'s Mem. in Supp. of Mot. to Suppress at 15; *see also id.* at 4 ("[W]hen the police reached Mr. Rhodes, they immediately grabbed him by the wrist, tackled him to the ground, and handcuffed him. . . . We submit the actions of the police constituted an arrest of Mr. Rhodes."). This argument is not without some force: Detective Brandefine aggressively confronted Mr. Rhodes in the bodega and forced him to the ground as Mr. Rhodes was eating a candy bar. Nevertheless, for the reasons explained below, Mr. Rhodes's argument ultimately fails.

The Second Circuit counsels that "[t]here are no hard and fast rules for evaluating the conduct of law enforcement agents conducting investigative stops." *United States v. Alexander*, 907 F.2d 269, 272 (2d Cir. 1990). Sometimes an interaction that looks in some respects like an arrest may, in fact, be properly classified as a *Terry* stop. "In assessing whether the degree of restraint was too intrusive to be classified as" a *Terry* stop, courts in this Circuit consider various factors, including "the amount of force used by police," "the extent to which the individual's freedom of movement was restrained," "the number of agents involved," and "whether the target of the stop was suspected of being armed." *United States v. Perea*, 986 F.2d 633, 645 (2d Cir.

6

1993). With respect to the last factor, when the police have reason to believe that the person they are seeking to *Terry* stop is armed, "the Fourth Amendment permits the officer to take 'necessary measures . . . to neutralize the threat' without converting a reasonable stop into a *de facto* arrest." *United States v. Newton*, 369 F.3d 659, 674 (2d Cir. 2004) (citing *Terry*, 329 U.S. at 24). "Intrusive and aggressive police conduct is not an arrest when it is a reasonable response to legitimate safety concerns on the part of the investigating officers." *United States v. Vargas*, 369 F.3d 98, 102 (2d Cir. 2004).

Such was the case here. Detective Brandefine went into the bodega specifically intending to effectuate a *Terry* stop of Mr. Rhodes because, as explained *infra*, he had reasonable articulable suspicion that Mr. Rhodes was armed. Under these circumstances—that is, where "faced with the possibility of danger"—Detective Brandefine "ha[d] a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exist[ed]." *Alexander*, 907 F.2d at 272. Here, that entailed bringing Mr. Rhodes to the ground to subdue him ahead of a pat down for weapons.[7] And in the process, Detective Brandefine discovered Mr. Rhodes was armed, at which point the detective had probable cause to arrest Mr. Rhodes for being a felon in possession. The brief period between Detective Brandefine making contact with Mr. Rhodes and Detective Brandefine discovering Mr. Rhodes's gun can properly be described as a *Terry* stop, albeit one that was "intrusive and aggressive," *Vargas*, 369 F.3d at 102.

---

[7] When a police officer seeks to frisk, or pat down, a person detained in a *Terry* stop, he must have "a reasonable basis to think 'that the person stopped is armed and dangerous.'" *Bailey*, 743 F.3d at 332 (quoting *Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009)). As explained *infra*, Detective Brandefine had "a reasonable basis to think that" Mr. Rhodes was "armed and dangerous" when he approached Mr. Rhodes in the bodega.

7

In sum, the Court holds that the brief interaction between when Detective Brandefine seized Mr. Rhodes and when Detective Brandefine discovered Mr. Rhodes's gun was a *Terry* stop, not an arrest. While perhaps more intrusive than the average *Terry* stop, Detective Brandefine's actions were a reasonable response to encountering an individual suspected of being armed, particularly given that the individual—Mr. Rhodes—was in a relatively small space with several innocent bystanders nearby.

### II. The NYPD Possessed the Requisite Reasonable Suspicion to *Terry* Stop Mr. Rhodes

Because Mr. Rhodes was being *Terry* stopped, not arrested, when the police recovered his gun, the only remaining question is whether the police had the reasonable suspicion necessary to make the *Terry* stop. The Court holds that they did. At the time of the stop, Detective Brandefine had reasonable suspicion both that Mr. Rhodes had committed the crime of being a felon in possession of a firearm and that Mr. Rhodes was armed.

As explained *supra*, *Terry* stops require something less than probable cause for an arrest. A *Terry* stop requires that the police have "reasonable suspicion," which is "a reasonable basis to think that the person to be detained 'is committing or has committed a criminal offense.'" *Bailey*, 743 F.3d at 332 (quoting *Johnson*, 555 U.S. at 326). "Reasonable suspicion is less than probable cause," *United States v. Hawkins*, 37 F.4th 854, 857 (2d Cir. 2022). Both the Supreme Court and the Second Circuit have described the reasonable suspicion standard as "not high." *United States v. Patterson*, 25 F.4th 123, 136 (2d Cir. 2022) (citing *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997)). Instead, a court's analysis as to whether a police officer had reasonable suspicion to effectuate a *Terry* stop is "rather lenient." *United States v. Santana*, 485 F.2d 365, 368 (2d Cir. 1973). This means that a court, looking at the "totality of the circumstances," *United States v. Arvizu*, 534 U.S. 266, 273 (2002), need only be satisfied that the police had "facts sufficient to

give rise to a reasonable suspicion that criminal activity 'may [have] be[en] afoot.'" *Patterson*, 25 F.4th at 136 (citing *Bailey*, 743 F.3d at 332). The officer's facts must be "specific and articulable." *Terry*, 392 U.S. at 22. "An inchoate and unparticularized suspicion or hunch cannot support reasonable suspicion, although an officer is permitted to draw on his own experience and specialized training to make inferences from and deductions about the cumulative information available to him that might well elude an untrained person." *Hawkins*, 37 F.4th at 857-58. And, critically, because the touchpoint for evaluating the police's conduct in effectuating a *Terry* stop is "reasonableness," "searches and seizures based on mistakes of fact can be reasonable." *Heien v. North Carolina*, 574 U.S. 54, 61 (2014).

In this case, Detective Vargas suspected that Mr. Rhodes was armed based on numerous factors, including his observation of Mr. Rhodes's movements, his knowledge of Mr. Rhodes's prior arrests, and his understanding that the intersection where he observed Mr. Rhodes was a high-crime area where the NYPD had investigated multiple shootings and recovered multiple guns.[8] This suspicion was reasonable based on the detective's training and experience as a police officer. That Detective Vargas may have been mistaken about some of the details regarding Mr. Rhodes's prior arrests does not undercut his reasonable suspicion because the touchstone is whether the mistake was reasonable.[9] What matters is that Mr. Rhodes had a prior arrest for gun possession

---

[8] Mr. Rhodes makes much of the fact that each observation Detective Vargas pointed to in support of his reasonable suspicion has an equally plausible innocent explanation. For example, Mr. Rhodes argues that other items could have caused the bulge in his sweatpants and that walking away from the scene of a dispute after the police arrive "cannot be a contributing factor toward a probable cause determination" because "it is lawful to walk away when the police arrive on the scene of a dispute especially if the person walking away is not a party to the dispute." Def.'s Mem. in Supp. of Mot. to Suppress at 9-10. These arguments are unavailing because a court need not "eliminate 'all possible innocent explanations' for conduct before deeming it suspicious." *Patterson*, 25 F.4th at 136 (citing *Bailey*, 743 F.3d at 333).

[9] Mr. Rhodes identifies several discrepancies or errors in the Complaint. For example, the Complaint states that PO-1, later identified as Detective Vargas, recovered a gun from Mr.

and that Detective Vargas was aware of that arrest. And Detective Vargas's reasonable suspicion was shared by Detective Brandefine because "where law enforcement authorities are cooperating in an investigation . . . the knowledge of one is presumed shared by all." *Illinois v. Andreas*, 463 U.S. 765, 771 n.5 (1983).

Therefore, for the reasons explained above, Detective Brandefine had the requisite reasonable articulable suspicion to detain Mr. Rhodes on a *Terry* stop and to search him for weapons. And as also explained above, the interaction that took place between Detective Brandefine and Mr. Rhodes from when they first made contact to when the gun was discovered was a *Terry* stop. Suppression is, therefore, not warranted.

## CONCLUSION

For the reasons explained above, Defendant's Motion to Dismiss is **DENIED**.

SO ORDERED.

Dated: June 26, 2025
New York, New York

 DALE E. HO
 United States District Judge

---

Rhodes's waistband in a prior arrest. Compl. ¶ 3(a) ("[O]n or about March 29, 2023, PO-1 himself arrested Rhodes less than one block away from the intersection of Madison Street and Rutgers Street . . . and found a loaded, nine-millimeter firearm in Rhodes's waistband."). This is not correct: the complaint in Mr. Rhodes's New York State case "stated the gun was recovered from a kitchen," not from Mr. Rhodes's person. Reply Mem. in Further Supp. of Mot. to Suppress at 23. Mr. Rhodes argues that these and other discrepancies in the Complaint mean that the police did not have reasonable suspicion to *Terry* stop him. But the detective's reasonable mistake about where the gun was located during Mr. Rhodes's prior arrest does not negate his knowledge that Mr. Rhodes had a prior arrest for possessing a firearm, which is ultimately the critical predicate fact here.